IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VICTORIA HICKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 05 C 6427 |
| | ) | |
| THE INVISIBLE FENCE | ) | Judge Ronald A. Guzmán |
| COMPANY OF NORTHEAST | ) | |
| OHIO, INC. and J.G.B. | ) | |
| DISTRIBUTING, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Victoria Hickey has sued The Invisible Fence Co. of Northeast Ohio, Inc. and J.G.B. Distributing, Inc. for sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Defendants have moved for summary judgment. For the reasons provided in this Memorandum Opinion and Order, the Court grants the motion.

## FACTS[1]

Defendants distribute, sell, install and service invisible electronic fences inside and outside of customers' homes. (Defs.' LR 56.1(a)(3) ¶ 2.) Defendants also provide pet training regarding the use of invisible electronic fences as well as general obedience training. (*Id.* ¶¶ 2, 6.)

---

[1] Unless otherwise noted, the following facts are either undisputed or deemed admitted because the party's response failed to comply with Local Rule 56.1, which this Court strictly enforces. This section does not include any fact that was unsupported by the proponent's citation to the record or solely supported by inadmissible statements, *e.g.*, hearsay.

In April 2003, defendants hired Victoria Hickey as a full-time pet trainer. (*Id.* ¶ 3.) As a pet trainer, Hickey would work with customers and their pets after the installation of an Invisible Fence System regarding the use of the system. (*Id.* ¶ 6.) She also conducted obedience training. (*Id.*) Her hours varied depending on when customers set up their appointments. (*Id.* ¶ 7.) Hickey's territory consisted of anything south and west of Chicago within Illinois. (*Id.*)

Jim Plizga, Hickey's immediate boss and often referred to by Hickey as "J.P.", was Assistant Director of Operations and oversaw the Chicago area Retail Center as well as the Detroit, Cleveland and Pittsburgh Retail Centers. (*Id.* ¶¶ 10-11; Plizga Dep. at 7; Hickey Dep. at 27.) Plizga's immediate boss was Todd Music, Director of Operations. (Defs.' LR 56.1(a)(3) ¶ 10; Plizga Dep. at 7; Music Dep. at 10.)

In January 2004, Hickey began receiving infertility treatments, and at some point in 2004, she notified Music and told him that she was going to start In Vitro Fertilization ("IVF") treatments in October 2004. (Defs.' LR 56.1(a)(3) ¶¶ 37-38.) Hickey stated that the following co-workers also knew that she was going through infertility treatments: Celeste Simon, Deron Ellington, Anna Moses and Lindsay Niozzi. (*Id.* ¶ 39.) Hickey states that O'Brien also may have known. (*Id.*) Hickey admits that defendants were flexible in letting her take time off for her IVF treatments, and that she did not have any problems getting the time off she needed. (*Id.* ¶ 40.) Hickey concedes that, on occasion, she would need to take time off for IVF therapy, that she might have provided less than twenty-four hours' notice and that defendants accommodated her. (*Id.* ¶ 41.) In March 2005, Hickey stopped her IVF treatments and related that fact to Music. (*Id.* ¶ 42.)

In February 2004, defendants acquired a large retail operation from an independent dealer in Woodridge, Illinois. (Defs.' LR 56.1(a)(3) ¶ 13.) This basically doubled the territory

size of the Chicago area Retail Center. (*Id.*)

In the fall of 2004, Music talked to Plizga about possibly creating a head trainer position in the Chicago area Retail Center to oversee the obedience training program because obedience training might develop into a revenue stream sometime in the future. (*Id.* ¶ 16.) Plizga mentioned that Hickey may be a good candidate for such a position. (*Id.*)

Plizga then told Hickey that defendants were going to create a head trainer position and a head technician position and that the creation of the positions was pending financial approval. (*Id.* ¶ 18.) Plizga had no authority to create any new positions. (*Id.* ¶ 19.) The position of head trainer was never created in the Chicago area Retail Center. (*Id.* ¶ 20.) Hickey last spoke to Plizga about the possibility of being promoted or the creation of a head trainer position in the fall of 2004. (*Id.* ¶ 21.) Hickey believes that one of the owners made the decision not to create the head trainer position. (Hickey Dep. at 37-38.)

At the 2004 corporate Christmas party, Hickey asked Music about the status of her promotion or whether there was any update on her promotion. (Defs.' LR 56.1(a)(3) ¶ 43.) Prior to that comment, Music had never spoken to Hickey about any promotion, and thus Music did not know what Hickey was talking about and he tried to change the subject quickly. (*Id.* ¶ 44.) Because Hickey had told him previously about her attempts to become pregnant and because it was a common topic of discussion between them, Music asked how things were going, whether she was starting to make plans as to what she would do for child care arrangements and whether she would change her work schedule. (*Id.* ¶ 45.) Hickey later asked Music to step outside and told him that she did not think that it mattered whether she became pregnant or not and that she did not have any plans to leave. (*Id.* ¶ 46.) Music responded that he did not mean it in any derogatory way, but he was just wondering whether she had thought about

3

child care expenses. (*Id.*) Hickey did not notify human resources about her complaints about Music's comments at the Christmas party until after she had filed her charge of discrimination with the EEOC. (*Id.* ¶ 52.)

At the same Christmas party, Mark Mekota, one of defendants' owners and Music's boss, approached Justin O'Brien, one of the employees who had previously worked for the independent dealer in Woodridge, Illinois, that defendants acquired and who defendants hired as part of the acquisition. (*Id.* ¶ 23; Pl.'s LR 56.1(b)(3)(B) ¶ 12.) Mekota told O'Brien that he was being considered for a promotion. (Defs.' LR 56.1(a)(3) ¶ 23; Pl.'s LR 56.1(b)(3)(B) ¶ 12.)

By the beginning of 2005, defendants' owners had decided to split Plizga's duties by geographic locations. (Defs.' LR 56.1(a)(3) ¶ 22.) Plizga would continue to oversee the Retail Centers in Cleveland, Pittsburgh and Detroit, and a new position, Regional Field Manager, would be created to oversee the Chicago area Retail Center. (*Id.*; Moore Dep. at 49.)

In March 2005, Music offered O'Brien the newly created position of Regional Service Manager to replace Plizga's role in the Chicago area Retail Center. (Defs.' LR 56.1(a)(3) ¶ 27.) O'Brien had worked for the Invisible Fence Company for approximately five years, and after three years of experience as a service technician and dog trainer, he performed installations for approximately two years. (*Id.* ¶ 25.) After he started to work for defendants in February 2004, he became one of the lead technicians in the field and was fulfilling a supervisory role. (*Id.* ¶ 26; Music Dep. at 61.)

Hickey believes that the new position was a combined promotion of head trainer and head technician to supervise all of the staff in Illinois. (Hickey Dep. at 68.) Approximately 80% of the new combined position involved being a service technician and installer. (Defs.' LR 56.1(a)(3) ¶ 34.) Hickey states that O'Brien was less qualified for the pet training part of the

4

position, but that O'Brien was more qualified for the technician part of the position. (Hickey Dep. at 69.) Hickey admits that she was not 100% qualified for the head technician duties of the new combined position. (*Id.* at 31.) Although Hickey admits that she never supervised any employee while employed by defendants (*id.* at 43), she believes she was qualified to supervise everyone in Illinois because O'Brien "always called her for advice when he was promoted" (*id.* at 39).

In April 2005, defendants asked Hickey to cover a one-time appointment on a Saturday because another employee had called in sick. (Defs.' LR 56.1(a)(3) ¶ 48.) She already had another appointment scheduled for that day in St. Charles. (*Id.*) When defendants tried to schedule her with the other appointment as well, Hickey complained and asked to have the other appointment removed from her schedule. (*Id.*) Music sent Hickey an email and asked her whether she really could not take the other training appointment and stated that defendants had been extremely flexible during her IVF therapy with all of her last-minute needs to take days off. (*Id.* ¶ 49.) Music also sent a copy of the email to Niozzi and O'Brien. (Hickey Dep., Ex. 14, Email from Music to Hickey of 4/15/05.) Hickey did not notify human resources about her complaints about Music's comments in his email until after she had filed her charge of discrimination with the EEOC. (*Id.* ¶ 52.) Besides the April 2005 email, Hickey does not remember any specific details about any other incident in which anybody had commented on the time that she had been taking off for IVF therapy. (*Id.* ¶ 51.)

On May 3, 2005, Hickey called off from work to file a charge of sex discrimination with the EEOC based on O'Brien's being promoted instead of her. (*Id.* ¶ 71; Hickey Dep. at 78.) On May 4, 2005, Hickey notified defendants that she had filed the charge. (Defs.' LR 56.1(a)(3) ¶ 71.)

5

On May 16, 2005, Hickey received a verbal warning for attendance issues during her annual performance review. (*Id.* ¶ 53.) Although Hickey did not recall having any attendance problems prior to May 3, 2005 (Hickey Dep. at 78), her employee file indicates that she called off work on April 11, April 12, April 27, and May 12, 2005, after she had discontinued her fertilization treatments in March 2005 (Defs.' LR 56.1(a)(3) ¶ 42). Defendants' employee handbook provides that two absences within a ninety-day period was considered excessive. (*Id.* ¶ 56.)

Hickey believes she took other days off work and, although she does not remember the date, she believes she called off work one day to have her central air conditioning unit repaired. (*Id.* ¶ 54; Hickey Dep. at 78-79.) On June 2, 2005, Hickey was issued a one-week suspension for attendance. (Defs.' LR 56.1(a)(3) ¶ 55; Hickey Dep. at 72, 76-77.) After looking for a couple of days, Hickey found a job during her suspension. (Defs.' LR 56.1(a)(3) ¶ 57; Hickey Dep. at 74.)

On June 6, 2005, Hickey gave defendants her two-week notice of resignation. (Defs.' LR 56.1(a)(3) ¶ 57; Hickey Dep. at 72.) On June 6, 2005, Mark Mekota, one of defendants' owners, accepted her notice, marked the "termination" box on an Employee Action Notice and noted that her last day of work would be June 16, 2005. (Hickey Dep. Ex. 20, Employee Action Notice.) On June 20, 2005, Hickey started her new job. (Defs.' LR 56.1(a)(3) ¶ 70.)

On June 22, 2005, Hickey filed a charge of retaliation with the EEOC. (*Id.* ¶ 72.) On August 30, 2005, the EEOC provided Hickey with the right-to-sue letter. (Hickey Dep. Ex. 3, EEOC Dismissal and Notice of Rights.) On November 9, 2005, Hickey filed the instant suit. (Compl.)

## Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), the Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering evidence submitted by the parties, the court does not weigh it or determine the truth of asserted matters. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All facts must be viewed and reasonable inferences drawn in the light most favorable to the non-moving party. *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). "If no reasonable jury could find for the party opposing the motion, it must be granted." *Hedberg v. Ind. Bell Tel. Co., Inc.* 47 F.3d 928, 931 (7thCir. 1995).

Defendants have moved for summary judgment arguing that Hickey has failed to create a genuine issue as to a material fact regarding her sex discrimination and retaliation claims. The Court addresses each claim in turn.

## I. Sex Discrimination

Title VII prohibits employers from discriminating against an employee based on sex. 42 U.S.C. § 2000e-2(a)(1). The burden is on the plaintiff to prove intentional discrimination by a preponderance of the evidence. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

The basis for Hickey's sex discrimination claim is that defendants promoted Justin O'Brien to Regional Operations Manager instead of her because she was undergoing fertility treatments. A Title VII plaintiff can make out his or her discrimination claims through either the direct or indirect method. *Huff v. UARCO Inc.*, 122 F.3d 374, 380 (7th Cir. 1997). Hickey has

elected to proceed under the indirect method. (Pl.'s Resp. Defs.' Mot. Summ. J. 7.)

Under this method, a plaintiff must first make out a *prima facie* case of discrimination by establishing that (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she was subject to a materially adverse employment action; and (4) other employees who were similarly situated but outside of the protected class were treated more favorably. *See id.* Once a plaintiff establishes a *prima facie* case, the burden of production then shifts to defendant to show a legitimate, non-discriminatory reason for its actions. *Id.* If defendant produces a legitimate, non-discriminatory reason, the burden then shifts back to the plaintiff to show that defendant's stated reason is a pretext for discrimination. *Id.* However, the ultimate burden of proving intentional discrimination rests at all times with the plaintiff. *Id.*

Defendants first argue that Hickey's sex discrimination claim fails as a matter of law because she does not fall within a class protected by Title VII. Two circuits have held that because infertility is a medical condition that afflicts men and women with equal frequency, seeking infertility treatment does not give rise to grounds for pregnancy discrimination. *See Saks v. Franklin Covey Co.*, 316 F.3d 337, 346 (2d Cir. 2003); *Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 679-80 (8th Cir. 1996). At least one court in this district has found this persuasive authority equally applicable in Title VII sex discrimination cases. *Hall v. Nalco Co.*, No. 04 C 7294, 2006 WL 2699337, at *2 (N.D. Ill. Sept. 12, 2006). The Seventh Circuit has not spoken on the issue. *Id.* This is an issue the Court need not reach. For the reasons provided below, even if Hickey were a member of a protected class, her sex discrimination claim would still fail.

Even if Hickey were able to establish the first three requirements of the *prima facie* case, she has failed to satisfy the fourth requirement. In short, Hickey has failed to create a genuine

8

issue of material fact as to whether a similarly situated person outside of the protected class was treated more favorably.

The following facts are undisputed. Plizga told Hickey that, pending financial approval, defendants were going to create a head trainer position as well as a head technician position. (Defs.' LR 56.1(a)(3) ¶ 16.) Plizga spoke to Hickey about the possibility of her being promoted to the position of head trainer in the Chicago area Retail Center in the fall of 2004. (*Id.* ¶ 21.) However, Plizga had no authority to create any new positions. (*Id.* ¶ 19.) The position of head trainer was never created in the Chicago area Retail Center. (*Id.* ¶ 20.) Although she is not sure, Hickey believes that one of the owners decided against creating the head trainer position. (Hickey Dep. at 37.)

The position that was eventually created was Regional Service Manager, a combination of the head trainer and head technician positions which was responsible for supervising all of the staff in Illinois. (*Id.* ¶ 27; Hickey Dep. at 68.) Approximately 80% of the Regional Service Manager position involved being a service technician and installer, and 20% involved pet training, customer service, administration, vehicle and machine/tool maintenance, employee development, store profitability, leadership, and communication. (Defs.' LR 56.1(a)(3) ¶ 34; Hickey Dep. Ex. 1, Position Description of Regional Service Manager.) Justin O'Brien had three years of experience as a service technician and two years of experience as an installer for the Invisible Fence Company. (*Id.* ¶ 25.) From February 2004 to March 2005, O'Brien became one of the lead technicians in the field. (*Id.* ¶ 26.) Hickey admits that O'Brien was more qualified for the technician part of the position and that she was not 100% qualified for the head technician duties of the position. (Hickey Dep. at 31, 69.) Hickey states that: (1) she has the knowledge to install Invisible Fence systems, but she has never done it; (2) she can service all

9

models of Invisible Fence; (3) she did not receive training regarding the machine equipment necessary to install Invisible Fence systems; (4) she would not be able to train new staff in the field as to how to install fences; and (5) she never supervised any employee while employed by defendants. (*Id.* at 43, 47-48.)

Given the disparity between the qualifications of O'Brien and Hickey regarding the service technician and installation duties of the Regional Service Manager position, no reasonable jury could find that O'Brien and Hickey were similarly situated. Although Hickey believes she was qualified to supervise all staff in Illinois because O'Brien "always called her for advice when he was promoted" (*id.* at 39), her assessment of her own performance is insufficient to raise a genuine issue of material fact. *See Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 843 (7th Cir. 1996.)

Even if a plaintiff establishes a *prima facie* case of sex discrimination, she must still show that defendant's stated reasons for the adverse employment action were a pretext for discrimination. *See St. Mary's*, 509 U.S. at 506. Unless a plaintiff can show that a defendant did not honestly believe its reasons, she loses "even if the reasons are foolish or trivial or baseless." *Kariotis v. Navistar Int'l Transp. Co.*, 131 F.3d 672, 676 (7th Cir. 1997) (citing *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.")). Proving pretext requires a plaintiff to show one of three things: (1) that defendant's reason had no basis in fact; (2) that defendant's explanation was not the real reason for the adverse employment action; or (3) that defendant's articulated reason did not justify the adverse employment action. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d

644, 652 (7th Cir. 2001). Plaintiff must rebut each and every one of defendant's reasons by presenting facts that tend to show defendant's reasons are false, thereby either showing or implying that the real reason is impermissible discrimination. *See Kariotis*, 131 F.3d at 677.

Defendants state that they promoted O'Brien because he was qualified as a technician, installer, and pet trainer. Hickey argues that the following facts create triable issues regarding whether defendants' reasons for promoting O'Brien instead of her are a pretext for sex discrimination: (1) Music did not post the job opening, (2) none of the candidates considered for the job opening submitted a resume; (3) Music recalled interviewing O'Brien (although O'Brien did not recall being interviewed); and (4) Music states that he considered three male candidates for the position. The Court disagrees. No reasonable jury could infer from these facts that defendants' real reason for not considering Hickey for the promotion was her gender.

First, unfortunately for Hickey, there is no statement of fact that provides that defendants always and without fail followed a particular protocol with regard to each and every hiring or promotion. The facts that Music did not post the job opening or require the submission of resumes supports an inference that his search for candidates was loose and informal, but not that the real reason he promoted O'Brien over Hickey was gender.

Second, the fact that Music says he interviewed O'Brien while O'Brien recalls no such interview might suggest that Music lied about interviewing O'Brien. However, again, this does not support the conclusion that Music's real reason for promoting O'Brien over Hickey was Hickey's gender. *See Johnson v. Univ. of Wis.-Milwaukee*, 783 F.2d 59, 64 (7th Cir. 1986) ("[P]laintiff must show that defendant's proffered reason is not just a pretext, but *a pretext for discrimination*." (emphasis added)).

Third, the fact that Music only considered males for the position, without more, does not

not create an issue of fact for trial regarding pretext. This fact is meaningless unless Hickey were to establish, which she did not, that there was a pool of qualified female applicants that Music did not consider. The record shows that, at the relevant time period, there were two women who performed installations, but they were located in Michigan and Pennsylvania, and Hickey has failed to establish that the geographic location was not a consideration in hiring someone to oversee the Chicago area Retail Center. It was her burden to establish that Music considered male, but not female, employees working in other geographic locations in order to create an issue of fact regarding pretext for gender discrimination. The record shows that O'Brien had worked for defendants in Illinois and it is unknown where the other two male candidates worked.

Further, Hickey has not even attempted to establish that either of the two other male candidates lacked qualifications for the position. Absent these facts, Music's consideration of three men for the position simply does not create a triable issue as to pretext.

In sum, Hickey has failed to create a genuine issue of material fact for trial regarding whether a similarly situated individual was treated more favorably and whether defendants' reasons for promoting a male employee instead of her were a pretext for sex discrimination. Accordingly, the Court grants defendants' motion for summary judgment as to her sex discrimination claim.

## II. Retaliation

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3. Retaliation claims may be proved either directly or indirectly.

*Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003) (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)).

Hickey seeks to prove her retaliation claim under the indirect method, which represents an adaptation of the burden-shifting approach announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Stone*, 281 F.3d at 644. Under this method, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she performed her job in accordance with her employer's legitimate expectations; (3) she suffered an adverse employment action in spite of satisfying the legitimate expectations of her employer; and (4) she was treated less favorably than similarly situated employees who did not engage in the statutorily protected activity. *Haywood*, 323 F.3d at 531.

As for the first prong of the *prima facie* case, it is undisputed that Hickey filed a sex discrimination charge against defendants on May 3, 2005 and that she told defendants of the charge on May 4, 2005. (Defs.' LR 56.1(a)(3) ¶ 71.) Thus, Hickey has established that she engaged in statutorily protected activity.

As for the third factor, Hickey argues that she was terminated and points to the Employee Action Notice dated June 6, 2005, which states that she was terminated and that the action was "[c]ompany initiated" for unacceptable conduct. (Hickey Dep. Ex. 20.) However, that document also states: "Tori Hickey was suspended on June 2, 2005 for 1 week due to repeated attendance policy violations. She subsequently offered her 2 week notice of resignation. Notice was accepted. Last day June 16, 2005." (*Id.*) Hickey testified that when she was told she was suspended, she immediately said that she was quitting and gave her two weeks' notice. (Hickey Dep. at 174.) Thus, she admits that she resigned on June 2, 2005 and gave her two-week notice. Though it characterizes Hickey's departure as a "termination," taken together, her deposition

testimony and the Employee Action Notice establish that defendants did not fire her but accepted her resignation on June 6, 2007.

To the extent that Hickey argues she was constructively discharged, her claim also fails as a matter of law. Constructive discharge can be an adverse employment action, but the evidence does not suggest that such a discharge occurred here. A constructive discharge occurred only if "working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). Working conditions are intolerable only if they are "even more egregious than [those that meet] the high standard for [a] hostile work environment [claim]." *Id.*

Plaintiff's working conditions after she filed her EEOC charge do not even approach the kind of conditions required to demonstrate a constructive discharge. *See, e.g., Taylor v. W. & So. Life Ins. Co.*, 966 F.2d 1188, 1190-99 (7th Cir. 1992) (evidence that over a four-year period African-American plaintiff's white supervisors subjected him to racist jokes, photographed plaintiff while holding a gun to his head and then passed the pictures around at the office saying, "This is what a n* * * * * looks like with a gun to his head," fondled plaintiff's wife, selectively enforced rules and policies against him, convinced him to transfer to an ailing office with an all black staff on the pretext that it was a good career move, subsequently denied him transfers because he was a black man and/or he was married to a white woman, and ultimately told him that he could not advance in the company because of his race and that of his wife established constructive discharge); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 416 n.1, 416-17, 423 (7th Cir. 1989) (holding that African-American woman was constructively discharged because, during her sixteen-month employment, her supervisor repeatedly used "racial slurs or a combination of

14

racial slurs and sexual innuendo in the office or at business-related social functions," repeatedly propositioned her, showed her a pornographic photo "depicting an interracial act of sodomy[,] told her that the photograph showed the 'talent' of a black woman [and] . . . stated that she was hired for the purpose [depicted]," and showed her several photocopies of a racist pornographic picture involving bestiality" and, when she attempted to grab one of them, "grabbed her arm and threatened to kill her"), *overruled in part on other grounds*, *Saxton v. Am. Tel & Tel. Co.*, 10 F.3d 526 (7th Cir. 1993). Because no reasonable jury could view Hickey's working conditions as intolerable, she was not constructively discharged.

Even if she could establish that she suffered an adverse employment action, Hickey has not established that she was meeting defendants' legitimate expectations. Defendants' employee handbook provides that two absences within a ninety-day period was considered excessive. (Defs.' LR 56.1(a)(3) ¶ 56.) Although Hickey does not recall having any attendance problems prior to May 3, 2005 (Hickey Dep. at 78), she admits that after she discontinued her IVF therapy but before she filed her EEOC complaint, she called off work on April 11, April 12, and April 27, 2005. (Defs.' LR 56.1(a)(3) ¶ 42.)[2] Moreover, even after she had been verbally warned of her excessive absenteeism, Hickey says she called off work another day to have her central air conditioning unit repaired. (*Id.* ¶ 54; Hickey Dep. at 78-79.) On June 2, 2005, Hickey was issued a one-week suspension for attendance. (Defs.' LR 56.1(a)(3) ¶ 55; Hickey Dep. at 72, 76-77.)

Hickey does not argue that defendants did not take the attendance policy seriously or did not consider five absences in a fifty-two-day period excessive. She merely states that she does

---

[2]She also admits calling off work on May 12, 2005. (*Id.*)

not recall having any attendance problems and did not keep a record of her days off of work. This is insufficient to create a triable issue regarding whether she was meeting defendants' legitimate expectations.

Further, Hickey has made no attempt to establish that she was treated less favorably than similarly situated employees who did not engage in the statutorily protected activity. She does not point to any other employee with similar absenteeism who did not complain and was not terminated. Thus, she has not satisfied the fourth prong of the *prima facie* case.

Even if Hickey were able to establish a *prima facie* case of retaliation, she has not created a genuine issue of material fact regarding pretext. Again, proving pretext requires a plaintiff to show one of three things: (1) that defendant's reason had no basis in fact; (2) that defendant's explanation was not the real reason for the adverse employment action; or (3) that defendant's articulated reason did not justify the adverse employment action. *See Hoffman-Dombrowski*, 254 F.3d at 652.

As discussed above, Hickey has not tried to show that defendants' reason for her termination, excessive absenteeism, has no basis in fact or did not justify her termination. Hickey relies on the timing of the verbal warning and the suspension in relation to her filing her EEOC charge in an attempt to show that defendants' reason was not the real reason for the warning, suspension and termination. (Pl.'s Resp. Defs.' Mot. Summ. J. 12.)[3]

"Speculation based on suspicious timing alone, however, does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse

---

[3]Again, Hickey argues that she had no performance or attendance issues prior to her filing of the EEOC charge on May 3, 2005. As discussed above, the record refutes this assertion because it establishes that she had called off of work on April 11, April 12, and April 27, 2005.

16

decision to the plaintiffs' protected actions." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000). Thus, "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Stone*, 281 F.3d at 644. This is so because "[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second. Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Sauzek*, 202 F.3d at 918 (citation omitted). "This is even more so when an intervening event between the protected activity and the adverse employment action exists." *Chapman v. Essex Group, Inc.*, No. 1:06-CV-84 TS, 2007 WL 1891813, at *11 (N.D. Ind. June 29, 2007).

Defendants became aware of Hickey's EEOC charge on May 4, 2005 (Defs.' LR 56.1(a)(3) ¶ 71), verbally warned her about excessive absenteeism for having called off work six times within ninety days, a fact that she admitted, on May 16, 2005 (Hickey Dep. Ex. 6; Hickey Dep. at 144) and suspended her for absenteeism on June 2, 2005 after she called off work to have her central air conditioning fixed (Defs.' LR 56.1(a)(3) ¶ 54; Hickey Dep. at 78-79). The fact that her warning and suspension occurred within weeks of her filing a EEOC charge does not, in and of itself, establish a triable issue. The record clearly shows that she continued to take off work after being verbally warned and she tendered her resignation upon being suspended, which constitute intervening events between the protected activity and the alleged termination. In essence, Hickey has failed to point to circumstances that reasonably suggest the two events are related to one another.

## CONCLUSION

For the foregoing reasons, this Court grants defendants' motion for summary judgment [doc. no. 38]. This case is hereby terminated.

**SO ORDERED**       **ENTERED:** 9/28/07

_____
**HON. RONALD A. GUZMAN**
**United States Judge**